**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America, | No. CR 16-8207-01-PCT-DGC |
| Plaintiff, | **ORDER** |
| v. | |
| Franklin Paul Eller, Jr., | |
| Defendant. | |

Defendant Franklin Eller is charged with various counts relating to the production and receipt of child pornography. He has filed several pretrial motions to which the government has responded. The Court decided some of the motions in a previous order (Docs. 160, 162), and held an evidentiary hearing on the remaining motions on December 20, 2019. This order resolves the remaining motions. The Court will not repeat the factual background contained in its previous order. *Id.*

## I. Motion to Suppress Custodial Statements (Doc. 124).

Defendant moves to suppress statements made during his initial interview with FBI agents on February 27, 2015. Defendant alleges that his statements were elicited in violation of the Fifth and Sixth Amendments as defined in *Miranda v. Arizona*, 384 U.S. 436 (1966). Doc. 124 at 5. The Court heard testimony at the December 20, 2019 hearing from FBI Special Agents Jim Kraus and Dawn Martin, who interviewed Defendant on February 27, 2015. For the reasons stated below, the Court will deny Defendant's motion.

**A.     Custody.**

*Miranda* warnings must be given only when a suspect is in custody and subject to government interrogation.  *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990).[1]  In *United States v. Craighead*, 539 F.3d 1073 (9th Cir. 2008), the Ninth Circuit addressed a question of first impression in this Circuit: "Under what circumstances under the Fifth Amendment does an interrogation by law enforcement officers in the suspect's own home turn the home into such a police-dominated atmosphere that the interrogation becomes custodial in nature and requires *Miranda* warnings?"  *Id.* at 1077.  *Craighead* noted that a suspect is in custody for purposes of *Miranda* "if the suspect has been 'deprived of his freedom of action in any significant way.'"  *Id.* at 1082 (quoting *Miranda*, 384 U.S. at 444).  "To determine whether the suspect was in custody, we first examine the totality of the circumstances surrounding the interrogation.  We then ask whether a reasonable person in those circumstances would have felt he or she was not at liberty to terminate the interrogation and leave."  *Id.* at 1082 (citations and quotations omitted).

To distinguish custodial from non-custodial interrogations, *Craighead* considered "the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of a home into a 'police-dominated atmosphere.'"  *Id.* at 1083.  *Craighead* identified several relevant factors: "(1) the number of law enforcement personnel and whether they were armed; (2) whether the suspect was at any point restrained, either by physical force or by threats; (3) whether the suspect was isolated from others; and (4) whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made."  *Id.* at 1085.  This list is not exhaustive.  *Id.*  The Ninth Circuit has identified several additional factors:

---

[1] "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). It is clear that the questioning of Defendant here was aimed at elicit incriminating responses, meeting the definition of an interrogation under *Miranda*.  Thus, the Court's analysis focuses on whether Defendant was in custody and whether the *Miranda* warnings were adequate.

"(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (quoting *United States v. Hayden*, 260 F.3d 1062, 1066 (9th Cir. 2001)); *see United States v. Salabye*, 623 F. Supp. 2d 1010, 1013 (D. Ariz. 2009).

Considering the totality of the circumstances, the Court concludes that a reasonable person in Defendant's position would not have felt free to leave or terminate the questioning. The Court will review each of the factors identified above.

1. <u>The number of law enforcement personnel and whether they were armed</u>. Seventeen law enforcement officers appeared at Defendant's door shortly after 6:30 a.m. on the morning of February 27, 2015. All were armed, and the entry team officers had their guns drawn as they entered Defendant's residence. Doc. 124 at 2. The officers remained at Defendant's home throughout the search and interrogation.

The Ninth Circuit noted in *Craighead* that "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere," and cited cases involving eight, seven, and five officers. *See* 539 F.3d at 1085. The seventeen armed officers in this case clearly contributed to such an atmosphere.

2. <u>Whether the suspect was at any point restrained</u>. After being awakened, Defendant and his roommate were immediately handcuffed while officers secured the apartment. Doc. 145 at 2. The handcuffs were removed after five to ten minutes. *Id.*

3. <u>Whether the suspect was isolated from others</u>. Defendant was questioned for nearly an hour and a half by Agents Martin and Kraus in their unmarked FBI vehicle. During this time he was separated from his roommate and the officers who were searching his apartment. In *Salabye*, this Court concluded that a defendant who was interviewed in a police vehicle outside his home was isolated from others. 623 F. Supp. 2d at 1014.

4. <u>Whether the suspect was informed that he was free to leave or terminate the interview, and the context in which any such statements were made</u>. It is not clear whether Defendant was told that he was free to leave. Agent Kraus testified that he did not tell Defendant this (Court's LiveNote Transcript ("Tr.") 9:15-24), and Agent Martin testified that it is her practice to say this, but she did not testify that she did so in this case (*Id.* at 38:6-12). In any event, the Court doubts that any such statement by the agents would have provided a reasonable alternative for Defendant when it was very early in the morning, Defendant was told he could not return to his apartment during the search, Defendant had no vehicle, and it was cold outside. As the Ninth Circuit said in *Craighead*, "an agent's statement that a suspect is free to leave may have more or less resonance with the suspect depending on whether he can leave the interrogation site and retreat to the safety of his home or whether his home is in fact the locus of police activity." 539 F.3d at 1088.

5. <u>The language used to summon the individual</u>. Defendant was asked by the agents if he would be willing to speak with them in an SUV vehicle outside. Doc. 145 at 2. Defendant agreed. *Id.* In general, when a suspect voluntarily agrees to accompany police with an understanding that questioning would ensue, this factor weighs against a finding of custody. *See Kim*, 292 F.3d at 974.

6. <u>The extent to which the defendant was confronted with evidence of guilt</u>. The agents confronted Defendant with evidence of his guilt. Agent Martin told Defendant that the evidence against him was "overwhelming." Doc. 126-1 at 37. Agent Kraus reiterated this point several times, stating "we have a ton of evidence," "more than I've ever seen in a case like this," and that it was "incredible how much evidence [they] had." *Id.* at 37-38. The Ninth Circuit found similar tactics to be relevant in *United States v. Lee*, 699 F.2d 466 (9th Cir. 1982), where "[t]he agents allowed [defendant] to repeat his exculpatory story, then for 15 minutes confronted him with evidence of his guilt, and told him it was time to tell the truth[.]" *Id.* at 468.

7. <u>The physical surroundings of the interrogation</u>. Defendant was interrogated in an FBI vehicle with the doors closed; Agents Martin and Kraus wore vests or jackets

with FBI lettering and logos; both agents were armed; and Defendant sat in the front passenger seat, with Agent Kraus next to him in the driver's seat and Agent Martin behind him in the backseat. The Ninth Circuit held in *Lee* that an interrogation was custodial when a suspect "was questioned in a closed FBI car with two officers for well over an hour while police investigators were in and around his house." *Id*. This Court reached the same conclusion in *Salabye*, 623 F. Supp. 2d at 1015.

8. <u>The duration of the detention</u>. Defendant was questioned for 85 minutes. As in *Kim*, this was "a full-fledged interrogation, not a brief inquiry." 292 F.3d at 977 (suspect detained for "some time" before questioning began, then for at least 30 minutes before an interpreter arrived and for another 20 minutes with the interpreter).

9. <u>The degree of pressure applied to detain the individual</u>. Other than the initial show of force and handcuffing, the agents do not appear to have applied any pressure to detain Defendant.

When all of these factors are considered, the Court concludes that the interrogation of Defendant was custodial. He was awakened early in the morning by seventeen armed officers, handcuffed for five to ten minutes, interrogated for 85 minutes in a closed FBI vehicle with two uniformed FBI agents, unable to return to his apartment, and repeatedly confronted with evidence of his guilt. A reasonable person in Defendant's position would not have felt free to leave or terminate the questioning.

**B.    Adequacy of the *Miranda* Warnings.**

Defendant argues that his *Miranda* warning was fatally defective. Doc. 124 at 6. "*Miranda* requires that a suspect be told, before questioning, that 'he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.'" *United States v. Loucious*, 847 F.3d 1146, 1149 (9th Cir. 2017) (quoting *Miranda*, 384 U.S. at 479).

Once in the vehicle, Agent Kraus made these statements to Defendant:

Yeah. So before – so I wanted to tell you kind of what – why we're here. Okay?

Before we do that, since we came to your house, and there's a bunch of people there, typically you know, we don't want to make you feel like you have to talk to us. Okay?

But like I said, what we like to do is – we'll tell you exactly what's going on. And if you want to talk to us, great. Okay?

\* \* \*

But before we ask any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you can't afford a lawyer, one will be appointed for you before any questioning, if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

And, the consent, it says, I've read the statement of my rights. I understand what my rights are. At this time, I'm willing to answer questions without a lawyer present.

MR. ELLER: Okay.

Doc. 124-1 at 11-12.[2]

In addition, Defendant was shown a written copy of the *Miranda* warning and read it as Agent Kraus stated Defendant's rights. The form said:

You have the right to remain silent.
Anything you say can be used against you in court.
You have the right to talk to a lawyer for advice before we ask you any questions.
You have the right to have the lawyer with you during questioning.
If you cannot afford a lawyer, one will be appointed for you before any questioning, if you wish.
If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

Doc. 145-1 at 2. Both agents signed the form. Doc. 145-2 at 2.

---

[2] Agent Martin told Defendant they were going to record the interview and asked if he was "okay with that?" He responded: "Yeah, that's fine." Doc. 145 at 3

- 6 -

Defendant does not argue that the advisement by Agent Kraus or the wording on the card were defective. Doc. 124 at 7. Defendant instead takes issue with what Agent Kraus said after he had recited the warnings quoted above:

| | |
|---|---|
| S.A. Kraus: | And so, basically, what— |
| Mr. Eller: | Okay. |
| S.A. Kraus: | --this says is, obviously, if you need-if you want or need a lawyer *after* we kind of talk, it's totally up to you. |
| Mr. Eller: | Yeah. |
| S.A. Kraus: | Okay. |
| Mr. Eller: | Well I just want to know what's going on here. |

Doc. 124-1 at 12 (emphasis added).

Defendant argues that this statement negated everything Agent Kraus said when he read Defendant the *Miranda* warning. Agent Kraus provided a different explanation. He testified that when he said Defendant could elect to use a lawyer "after we kind of talk," he meant after Agent Kraus explained why they were searching Defendant's home and before they asked Defendant any questions. Tr. 12:1-10. This explanation comports with Agent Kraus's statement at the beginning of the interview: "So before – so I wanted to tell you kind of what – why we're here." *Id.* at 11.

Defendant relies on *Florida v. Powell*, 559 U.S. 50 (2010), which specifically addressed the right to counsel prong of the *Miranda* warnings. *Powell* reiterated that as "an absolute prerequisite to interrogation," an individual "must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Id.* at 51 (citations omitted).

Viewing the exchange between Agent Kraus and Defendant in its entirety, the Court finds that this prerequisite has been met. Defendant was told repeatedly that he had the right to speak with a lawyer before answering questions:

- "You have the right to talk to a lawyer for advice *before we ask you any questions*."

- "You have the right to have a lawyer with you *during questioning*."

- If you can't afford a lawyer, one will be appointed for you *before any questioning*, if you wish."

- "If you decide to answer questions now without a lawyer present, *you have the right to stop answering at any time*."

Doc. 124-1 at 11-12 (emphasis added). In addition to hearing these words, Defendant read them on the warning card that was displayed to him as they were recited.

The Ninth Circuit has provided this explanation of *Miranda* warnings:

> The Supreme Court has not required a precise formulation of the warnings given to a suspect and has stressed that a talismanic incantation is not necessary to satisfy *Miranda*'s strictures. Instead, the inquiry is simply whether the warnings reasonably convey to a suspect his rights as required by *Miranda*. Reviewing courts need not examine *Miranda* warnings as if construing a will or defining the terms of an easement.

*Loucious*, 847 F.3d at 1149 (quotations and Supreme Court citations omitted). The Court concludes that the warnings Defendant received reasonably conveyed his right to counsel. Defendant was told four times that he could obtain legal counsel before questioning, and this advice was reinforced by the written warning he read. Agent Kraus's single ambiguous statement after the warnings were read did not eliminate the meaning or import of the four clear statements that preceded it.

Defendant did not express concern or confusion about his rights. He said "okay" after he was correctly advised of his rights, he consented to have the interview recorded, and he voluntarily consented to the FBI's assuming his online identity. Doc. 124-1 at 17. His exchanges with the agents do not suggest that Defendant did not understand the rights Agent Kraus read to him.

### C. Waiver.

In determining whether a defendant's waiver of his rights was knowing, intelligent, and voluntary, courts consider the totality of the circumstances. *See Unites States v. Price*,

921 F.3d 777, 791-92 (9th Cir. 2019). While a written waiver is strong evidence that a *Miranda* waiver is valid, *see North Carolina v. Butler*, 441 U.S. 369, 373 (1979), the government may show a defendant impliedly waived his rights under the circumstances, *see Price*, 921 F.3d at 792.

The circumstances in this case indicate that Defendant knowingly, intelligently, and voluntarily waived his rights. There is no indication in the recording of the *Miranda* warning (which the Court has listened to several times) that Defendant lacked mental capacity, misunderstood the warnings, or acted under duress. Defendant freely conversed with Agents Martin and Kraus for the duration of the 85-minute interview. He did not make any statements or ask any questions about his rights indicating he did not understand them. Nor did he attempt exercise his rights. Rather, after Agents Martin and Kraus began asking him questions, Defendant readily volunteered information about his personal life and the circumstances surrounding his Yahoo! account. The Court finds that even though Defendant did not sign the waiver form, the circumstances indicate that he knowingly agreed to waive his rights.[3]

## II. Search of Defendant's Yahoo! Account and Residence (Docs. 117, 119).

Defendant moves to suppress evidence obtained from the search and seizure of his Yahoo! email account and the search of his residence.[4] He argues that the Yahoo! search warrant ("Yahoo! Warrant") and the warrant for the search of his apartment ("Residence Warrant") are invalid for failing to demonstrate probable cause, are impermissibly

---

[3] Defendant also contends that the consent to search and resulting assumption of his online identity must be suppressed. Doc. 124 at 8. The Court disagrees. A person is capable of giving valid consent to a search while in custody. *See United States v. Lindsey*, 877 F.2d 777, 783 (9th Cir. 1989). Considering the circumstances surrounding the interrogation – including the fact that Defendant was given a written consent form which he read and signed – the Court finds that the consent was given freely and voluntarily. Doc. 124-1 at 17.

[4] The Stored Communications Act of 1986 authorizes the government to obtain the contents of communications stored electronically in an "electronic communications system" pursuant to a search warrant obtained under the Federal Rules of Criminal Procedure. *See* 18 U.S.C. §§ 2703(a), (b)(1)(A).

overbroad, and lack particularity. Doc. 117 at 2. The Court will address the two warrants together in addressing Defendant's arguments.

## A. Probable Cause Standard.

In assessing the existence of probable cause, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for concluding' that probable cause existed." *Id.* at 238-39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960) (ellipses and brackets omitted)). The Court must remember that a "fair probability" does not amount to "certainty or even a preponderance of the evidence," and the Court must not "flyspeck" the warrant affidavit through de novo review. *United States v. Gourde*, 440 F.3d 1065, 1069 (9th Cir. 2006) (en banc). The magistrate judge's determination is "paid great deference," *Gates*, 462 U.S. at 236, and suppression is an appropriate remedy only "when a warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]" *United States v. Grant*, 682 F.3d 827, 836 (9th Cir. 2012) (citations omitted).

## B. Child Pornography Definitions.

Defendant argues that the government relied on an invalid definition of child pornography in both warrant affidavits. Docs. 117 at 12, 119 at 4. In *Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002), the Supreme Court examined a provision of the Child Pornography Protection Act ("CPPA") which extended the federal prohibition against child pornography to any visual depiction that "is, or appears to be, of a minor engaging in sexually explicit conduct." 18 U.S.C. § 2256(8). The Supreme Court invalidated two provisions of § 2256 – the phrase "appears to be" in § 2256(8)(B) and all of § 2256(8)(D) – because they criminalized virtual images of child pornography that involved no actual minors in their production. *Id.* at 258.

### 1. Yahoo! Warrant.

Defendant argues that the Yahoo! Warrant affidavit was defective because it relied on the definition of child pornography found unconstitutional in *Free Speech Coalition*. *See* Doc. 117 at 12.  This is not correct.  The affidavit defined child pornography as:

> [A]ny visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct, (b) the visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct, or (c) the visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaged in sexually explicit conduct.

Doc. 117-1 at 6.  This language is taken verbatim from the current version of the CPPA, which was amended after *Free Speech Coalition*.  The amendment removed from § 2256(8)(B) the "appears to be" wording the Supreme Court found unconstitutional, and eliminated all of § 2256(8)(D).  The statute – and the affidavit – do not contain the language held invalid by the Supreme Court, and Defendant cites no case which has held the current wording of § 2256(8) unconstitutional.

### 2. Residence Warrant.

The definition of "child pornography" included in the Residence Warrant affidavit is the current definition in § 2256(8), as quoted above.  Doc. 119-1 at 6-7.  But the Residence Warrant added the following sentence to this definition: "For purposes of the search warrant, 'child pornography' also includes any photographs, images, or visual depictions of any minor, or person *appearing to be* a minor (i.e., under the age of 18 years), who is either nude or partially nude."  *Id* (emphasis added).  The warrant also included an incorrect definition of "minor" in Attachment B: "any person under the age of eighteen years or who *appears to be* under the age of eighteen years."  Doc. 119-1 at 9 (emphasis added).  Defendant argues that these statements invalidate the warrant.[5]

---

[5] Defendant argues that "assertion and reliance . . . [on] overbroad, unconstitutional, and incorrect legal definitions, were at the very least, made with reckless disregard for the truth.  *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978)."  Doc. 119 at 5.  Defendant cites *Franks,* but did not request a *Franks* hearing before or on December 20, 2019.

The government agrees that the phrases "appearing to be" and "appears to be" in these sentences is a legally incorrect addition to § 2256(8), but argues that they do not invalidate the warrant. The government argues that the first sentence, which follows the correct statutory definition of child pornography, begins with the words "for purposes of the search warrant," clearly suggesting that what follows is not part of the statutory definition. The government also offers several possible interpretations for the erroneous language. *See* Doc. 150 at 11.

Defendant cites no authority requiring suppression where a warrant affidavit includes an incorrect definition, nor does he explain how the incorrect definitions prevented a correct finding of probable cause. The Ninth Circuit has held that probable cause is not defeated even when a warrant affidavit relies on an incorrect statute. In *United States v. Meek*, 366 F.3d 705 (9th Cir. 2004), the two warrants at issue "listed the suspected offense to be a violation of California Penal Code § 311.3, but the attached affidavits described a violation of California Penal Code § 288.2." *Id.* at 711. The Ninth Circuit held:

> Related to the issue of probable cause is whether the AOL warrant is invalid simply because the statute Meek violated—California Penal Code § 288.2(b)—differed from the statute listed in the affidavit—California Penal Code § 311.3. We conclude that it is not. Because the affidavit established probable cause as to a violation of California law and the items sought under the warrant corresponded to that probable cause determination, the statutory variance in the affidavit is not fatal to the warrant's validity. *See United States v. Koyomejian*, 970 F.2d 536, 548 (9th Cir. 1992) (Kozinski, J., concurring) ("I am aware of no constitutional requirement that an applicant for a warrant specify, and the judge determine, the precise statute violated; all authority is to the contrary."), cited with approval in *United States v. Hill*, 55 F.3d 479, 481 (9th Cir. 1995).

*Id.* at 713. For reasons explained below, the Court finds that the affidavit in this case established probable cause to believe federal law had been violated, and, as discussed below, the items sought under the Residence Warrant corresponded to that probable cause determination. The incorrect definitions therefore do not invalidate the warrant.

**B.     Failure to Verify Images.**

Defendant argues that the government acted unreasonably in not independently confirming that images sent to Defendant's BARONWW1 email address were contraband. *See* Doc. 117 at 13.   But Defendant cites no authority imposing such a duty on the government.   In addition, the warrant affidavits show that images were reviewed by law enforcement before applying for the warrants.

**1.     Yahoo! Warrant.**

The affidavit for the Yahoo! Warrant identifies the affiant as an FBI agent with ten years' experience and training in child exploitation investigations through seminars, classes, and "everyday work related to these types of investigations."  Doc. 117-1 at 3.  It identifies a number of child sexual abuse crimes under investigation.  *Id.* at 5-6.  The affidavit explains the National Center for Missing and Exploited Children ("NCMEC") and the means by which it receives cyber tips concerning sexual exploitation of children.  The affidavit notes that that leads received by NCMEC are reviewed by "specially-trained analysts, who examine and evaluate reported content[.]"  *Id.* at 9.  The review includes images of child pornography and complete communications including any such images.  *Id.* at 10.  NCMEC refers images to various law enforcement agencies.  *Id.* at 9.

Based on her training and experience, the affiant also describes live webcam and internet exploitation of children, often located in the Philippines, in which people outside the Philippines use computers to arrange for the sexual exploitation of children.  Images of the sexual abuse are live streamed for the requesting party for a fee.  *Id.* at 13.

The affidavit states that a cyber tip report to NCMEC had identified 62 image files from a particular Yahoo! account which had been viewed by Yahoo! employees.  The affiant then describes three of the images in detail, clearly indicating that they are child pornography images of ten to twelve-year-old girls.  *Id.* at 21.  The specific jpg numbers for each of these images are provided in the affidavit.  *Id.*  The affidavit then identifies the Yahoo! account later identified as Defendant's – BARONWW1@YAHOO.COM – as

having received 60 of these images, including the three images described in detail by the agent. *Id.* at 25.

### 2. Residence Warrant.

The Residence Warrant was supported by the affidavit of Agent Martin, who at the time had more than ten years' experience in the FBI. Doc. 117-2 at 32. It notes that Agent Martin relied on information provided by an FBI agent with the Violent Crimes Against Children Section of the Major Case Coordination Unit of the FBI. *Id.* at 33. The affidavit provides essentially the same information about NCMEC and the live exploitation of children in the Philippines as the affidavit discussed above. *Id.* at 40-44. Agent Martin states that a cyber tip received by NCMEC concerned 75 image files sent from a Yahoo! account to Defendant's Yahoo! account; that Agent Martin reviewed 72 of the 75 images and determined that approximately 58 showed minors engaged in sexually explicit conduct; and describes three of the images in detail, making clear that they reflect sexual exploitation of children. *Id.* at 50-51. During the December 20, 2019 hearing, Agent Martin identified an error in the affidavit – two of the three files she specifically described in the affidavit were not sent to Defendant's account, but the first was sent to Defendant's account. That image displayed the sexual abuse of an eight- to ten-year-old female. *Id.* at 51.

Agent Martin's affidavit also quotes Yahoo! messenger chats in which Defendant apparently is watching a live stream of child sexual abuse and requesting specific sexual acts by the child and the adult he is watching. *Id.* at 53-55. The chats were obtained with the Yahoo! Warrant.

### 3. Analysis.

The Court has no difficulty concluding that these affidavits provide probable cause to believe that the communications reflected criminal acts, and that there was a fair probability that evidence of a crime would be found through the Yahoo! and residence searches. *Gates*, 462 U.S. at 238. Magistrate Judges Kay for the Yahoo! Warrant and Aspey for the Residence Warrant had substantial bases for concluding that probable cause existed. *Id.* at 238-39. The Court cannot conclude that the affidavits were defective

because the government failed to engage in further verification that the images were in fact child pornography. Each warrant was supported by the affidavit of an experienced FBI agent, described the process by which the cyber tips were reviewed, and described specific images and chats that reflect child pornography. *See New York v. P.J. Video, Inc.*, 475 U.S. 868, 874 n.5 (1986) ("[A] reasonably specific affidavit describing the content of a film generally provides an adequate basis for the magistrate to determine whether there is probable cause to believe that the film is obscene, and whether a warrant authorizing the seizure of the film should issue.").

As noted above, the Court must not "flyspeck" the warrant affidavit through de novo review. *Gourde*, 440 F.3d at 1069. The magistrate judge's determination is "paid great deference," *Gates*, 462 U.S. at 236, and suppression is an appropriate remedy only "when a warrant is based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *Grant*, 682 F.3d at 836. That standard has not been met here.

### C. Overbreadth.

#### 1. Yahoo! Warrant.

Defendant argues that the government's request for nearly a decade's worth of data, when the government's date range was only from January 1 to May 12, 2012, was overbroad. *See* Doc. 117 at 15. But the affidavit specifically noted that at least one of the email addresses associated with the sale of child pornography linked to Defendant had been actively associated with the production of child pornography since 2010. *See* Doc. 117-1 at 19-20. The affidavit also noted the ease with which child pornography images or communications can be stored by computer and located by forensic examiners even after being deleted. *Id.* at 12. And the affidavit noted that e-mail providers like Yahoo! retain various types of information about an account user's activity. *Id.* at 16.

Given all the circumstances surrounding the government's investigation as set forth in the affidavit, there was "a fair probability that contraband or evidence of a crime [would have been] found" on Defendant's email outside of the limited date range presented by the

- 15 -

government. *Gates*, 462 U.S. at 238; *see United States v. Morales-Aldahondo*, 524 F.3d 115, 118 (1st Cir. 2008) (information not stale despite being years old because special agent attested that those who download child pornography tend to retain images for years and use computers to augment and store collected images); *United States v. Irving*, 452 F.3d 110, 125 (2d Cir. 2006) (information not stale despite being years old because pedophiles are likely to hoard images of child pornography in their homes for extended periods of time).

## 2. Residence Warrant.

Defendant argues that the Residence Warrant "utterly and impermissibly fails to provide meaningful guidance to the executing officer(s)" because it directs them to search for and seize "fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 2252A." Doc. 119 at 6. But there is no requirement that a search warrant specify the precise manner in which the search is to be executed. *Dalia v. United States*, 441 U.S. 238, 257 (1979); *see Maryland v. Garrison*, 480 U.S. 79, 84 (1987). "The Fourth Amendment . . . does not set forth some general 'particularity requirement.' It specifies only two matters that must be 'particularly describ[ed] in the warrant: 'the place to be searched' and 'the persons or things to be seized.'" *United States v. Grubbs*, 547 U.S. 90, 97 (2006) (citing *Dalia*, 441 U.S. at 257). In determining whether a warrant is particular enough, the Ninth Circuit considers various factors, including (1) whether probable cause exists to seize all items of a particular type described in the warrant, (2) whether the warrant sets out objective standards by which executing officers can differentiate items subject to seizure from those which are not, and (3) whether the government is able to describe the items more particularly in light of all the information available to it at the time the warrant was issued. *United States v. Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986).

The Residence Affidavit provided probable cause to seize items that might contain digital evidence of the crimes under investigation, which necessarily is a broad category. Where digital evidence is concerned, the Ninth Circuit has upheld broad warrants in child pornography cases. In *United States v. Schesso*, 730 F.3d 1040 (9th Cir. 2013), the Ninth

Circuit held that a warrant for the seizure and off-site electronic search of *all* computer equipment and *all* digital storage devices in defendant's home, for evidence of possession of or dealing in child pornography, was not overbroad. *Id.* at 1046. The court of appeals reached a similar result in *United States v. Hay*, 231 F.3d 630 (9th Cir. 2000), and upheld a warrant authorizing the seizure of the defendant's computer system, including its "hardware, software, records, instructions or documentation, and depictions of child pornography." *Id.* at 633. This warrant was not overbroad because its preface limited the search and seizure to materials constituting evidence of offenses relating to the sexual exploitation of minors and the government otherwise had no way of knowing where the images were stored. *Id.* at 637. Because the Residence Warrant was limited to the seizure of evidence relating to child pornography, the seizure of all "[a]ll computers, computer hardware and any form of electronic storage that could contain evidence [of child pornography]" was necessary and not overbroad. *See* Doc. 119-1 at 19.

In short, based on a review of the warrant affidavit, the Court finds that the government developed sufficient probable cause to seize digital evidence (*id.* at 20-28), the warrant set out proper standards by which officers were to identify items subject to seizure and those that were not (*id.* at 19-20), and the government was unable to describe the items more particularly in light of all of the information available to it at the time of the search (*id.* ¶ 24(c)). *See Spilotro*, 800 F.2d at 963.

Defendant's argument that the "fatal overbreadth [of the warrant] finds no cure in the extremely general, non-specific list of items" is unconvincing. Doc. 119 at 7. Even if a warrant is overbroad, an accompanying affidavit can cure the warrant's defect if it more particularly describes the items to be seized. *United States v. Luk*, 859 F.2d 667, 676 (9th Cir. 1988). Here, the list of "things to be searched for and seized" provided additional specificity. Doc. 119-1 at 37. The list was not so broad as to authorize the search and seizure of all things – it was limited to the "fruits, instrumentalities, and evidence of violations of 18 U.S.C. § 2252A" and to the seizure of items that would indicate a connection with the crimes charged here. *See id.* ¶¶ (a)-(k).

Defendant cites *United States v. Clark*, 31 F.3d 831, 836 (9th Cir. 1994), where the Ninth Circuit suppressed evidence obtained with a search warrant that, in part, authorized the seizure of "fruits and instrumentalities of a violation of Title 21, U.S.C. § 841(a)." *Id.* The court held that this portion of the warrant failed adequately to describe the items to be seized. *Id.* Defendant also relies on *United States v. Cardwell*, 680 F.2d 75 (9th Cir. 1982), and *United States v. Crozier*, 777 F.2d 1376 (9th Cir. 1985). Doc. 119 at 7. But none of these cases deal with the search and seizure of digital information, and the Court therefore does not find them helpful. *See* Doc. 119-1 at 19 (indicating in the "search methodology" section of the affidavit that "[a]ll computers, computer hardware and any form of electronic storage that could contain evidence described in this warrant will be seized for an off-site search for evidence[.]").

Likewise, Defendant's argument that the Yahoo! Warrant is invalid as executed because it is lacking in particularity is unpersuasive. *See* Doc. 117 at 15. Defendant points to Attachment B to the affidavit, which includes procedures by which data outside the scope of the warrant was to be segregated. Doc. 117-1 at 35. Defendant argues these procedures were not followed, which thus invalidates the warrant.

While Defendant concedes that protective measures are not a constitutional requirement, he argues that the "inquiry arguably changes when the government, of its own volition, avers it will follow protective measures in a warrant application that is granted." Doc. 117 at 15-16 n.6. Defendant primarily relies on *United States v. Comprehensive Drug Testing, Inc. ("CDT")*, 621 F.3d 1162 (9th Cir. 2010), for the argument that the search warrant here was "very exploratory and general indeed and cannot pass muster under the Fourth Amendment." Doc. 117 at 16.

*CDT* involved a federal investigation of a business that was suspected of providing steroids to professional baseball players. 621 F.3d at 1166. During the investigation, the government learned of ten players who had tested positive for steroid use, but later "seized and promptly reviewed the drug testing record for hundreds of players in Major League Baseball (and a great many other people)." *Id.*

The district court granted motions to quash the subpoenas, expressing "grave dissatisfaction with the government's handling of the investigation" and accusing the government of "manipulation and misrepresentation." *Id.* at 1167. The Ninth Circuit affirmed, and Chief Judge Kozinski criticized federal authorities for submitting a warrant application that omitted crucial information. *Id.* at 1178. The government's omission "created the false impression that, unless the data were seized at once, it would be lost." *Id.* Chief Judge Kozinski wrote that "omitting such highly relevant information altogether is inconsistent with the government's duty of candor in presenting a warrant application. A lack of candor in this or any other aspect of the warrant application must bear heavily against the government in the calculus of any subsequent motion to return or suppress the seized data." *Id.*

The Court does not find any lack of candor in this case, or efforts on behalf of the government to misrepresent information in the affidavit. The government did in fact make an effort to segregate the data. Agents reviewed the warrant returns for the various email accounts (including Defendant's BARONWW1 account) associated with the investigation and placed them into "pertinent" and "non-pertinent" folders. Doc. 150 at 25. The FBI agent in Flagstaff noted these designations and did not review the non-pertinent material. *Id.*

The Court will deny Defendant's motion to suppress evidence obtained by the Yahoo! Warrant and Residence Warrant.

**III.     Motion for Voluntariness Hearing and to Suppress Statements (Doc. 126).**

Defendant has an extensive history of mental health problems. *See* Doc. 126 at 7. He moves to suppress statements made during his February 27 and March 2, 2015 interviews on the ground that his mental health diagnoses rendered his statements involuntary. The Court disagrees.

There cannot be a finding of involuntariness under the Due Process clause in the absence of police coercion. *Colorado v. Connelly*, 479 U.S. 157, 167 (1986). When a confession is challenged, the government must establish voluntariness by a preponderance

of the evidence. *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004). "In determining the voluntariness of a confession, a court 'examines whether a defendant's will was overborne by the circumstances surrounding the giving of a confession.'" *Doody v. Ryan*, 649 F.3d 986, 1008 (9th Cir. 2011) (quoting *Dickerson v. United States*, 530 U.S. 428, 434 (2000)). The Court must consider the totality of the circumstances, including "the characteristics of the accused and the details of the interrogation." *Id.*; *see* 18 U.S.C. § 3501(b).

The Court has reviewed the transcript of the February 27, 2019 interview and finds no indication that the FBI agents were coercive. And Defendant identified no such evidence during the evidentiary hearing. Although, as noted above, the agents confronted Defendant with evidence of his guilt, they did not do so in a coercive or overbearing manner, and engaged in no other pressure tactics. The Court cannot conclude that Defendant's will was overborne during the interview. The Court will not suppress the February 27 interview on the basis of voluntariness.[6]

Defendant argues that his statements at the March 2, 2015 interview were involuntary because he had "a whole lot of energy," "made odd references, and expressed paranoid thought processes." Doc. 126 at 4. Having reviewed the transcript of the interview and Defendant's medical history, psychological evaluations, and general characteristics, the Court finds that Defendant's will was not overborne by the circumstances of the interview. *See Doody*, 649 F.3d at 1008. Although Special Agent Brian Fuller did encourage Defendant to admit the activities surrounding the allegations, his questioning was always direct and nothing in the record indicates threats or promises made in return for an admission of guilt. Defendant appeared to be cooperative, provided direct answers to the questions, and seemed engaged throughout the interview. What is

---

[6] Dr. Toma testified that during this interview Defendant appeared to be focused on learning why the agents were searching his house, and that Defendant appeared overly willing to talk. Tr. 64:5-16. But Dr. Toma provided no basis for concluding that Defendant's statements were due to law enforcement coercion or that his will was overborne.

1    more, Defendant has not identified any coercive police activity to support a finding that his
2    statements were not voluntary. *See Connelly*, 479 U.S. at 167.

3        Defendant contends that Agent Fuller preyed on his suicidal tendencies and
4    attempted to elicit a confession by referencing his "wish to die honorably." Doc. 126 at 6.
5    Dr. Toma testified to this effect at the December 20, 2019 hearing, noting that he believed
6    Agent Fuller attempted to manipulate a confession based on Defendant's suicidal thoughts.
7    Tr. 63:21-24.

8        Having reviewed the transcript, the Court does not agree. Defendant's will was not
9    overborne by the circumstances of the interview, including Agent Fuller's references to
10   Defendant's comments about suicide. *See Doody*, 649 F.3d at 1008. The Court highlights
11   the following exchange:

12   S.A. FULLER:     Are you suicidal today?

13   MR. ELLER:       No. I won't take my own life.

14   S.A. FULLER:     Okay. Have I done anything in here to pressure you or
15                    make you feel bad?

16   MR. ELLER:       No. It's not that. It's myself.

17   S.A. FULLER:     Okay. Have I been professional with you today?

18   MR. ELLER:       Yes.

19   S.A. FULLER:     Have I made you say anything that you did not want to
                      say?

20   MR. ELLER:       No. I – I had to say what was true.

21                    * * *

22   S.A. FULLER:     Okay. I haven't harassed you today, have I?

23   MR. ELLER:       No.

24   S.A. FULLER:     Has any of the FBI agents?

25   MR. ELLER:       No. They've been courteous.

27   Doc. 126-2 at 29-30.

28

The Court finds that Defendant was not improperly pressured or manipulated. The government has met its burden of showing that Defendant's statements at the February 27 and March 2 interviews were voluntary. The Court will deny Defendant's motion.

**IV. Defendants' Motion in Limine (Doc. 134).**

The Court's previous order (Docs. 160, 162) addressed Defendant's motion in limine. The parties and the Court engaged in further discussions about the motion during the evidentiary hearing. The Court will deny the motion, with the following observations in addition to those set out in the previous order:

(a) When settling jury instructions in this case, the Court will determine whether the government must prove that the victims were minors, or whether the government need only prove that Defendant believed they were minors. *See* Docs. 160, 161, 162, 164.[7]

(b) If the government must prove they were minors on some or all of the counts, the only evidence the government has for such proof are the statements of the individuals who engaged in Yahoo! chats with Defendant. Those statements will be admissible for the truth of the matter asserted (the victims' ages) only if they are admissible (a) as co-conspirator statements, which will require the Court to determine that Defendant and the other chat participant reached a meeting of the minds at some point and the ages were stated thereafter, and will also require some corroborating evidence of the conspiracy, or (b) if they are adoptive admissions, which the Court doubts for reasons stated in Docs. 160, 162 and during the evidentiary hearing.

---

[7] Ninth Circuit Model Instruction 8.192A, for violation of 18 U.S.C. § 2422(b), provides two options for the second element: either that the victim enticed, coerced, or persuaded was in fact under the age of 18, or that the defendant believed the victim was under the age of 18. As stated in some detail at the evidentiary hearing, the Court is not persuaded by Defendant's argument that that the second option is applicable only to sting operation cases. The conduct prohibited by § 2422(b) is criminal when the supposed victim is an adult law enforcement officer, and no less criminal when the victim is another adult. In both cases, the defendant has engaged in the same wrongful conduct: seeking to persuade or coerce a minor to engage in sexual activity.

(c) The statements of the other chat participants will not be barred by the hearsay rule if they are not admitted for the truth of the matter asserted, such as if they are admitted to show Defendant's state of mind – which may be enough to support a conviction if the government is not required to prove that the victims were minors, only that he believed they were minors.

**IT IS ORDERED:**

1. Defendant's motion to suppress custodial statements (Doc. 124) is **denied**.

2. Defendant's motion to suppress evidence obtained by the search and seizure of Defendant's Yahoo! account (Doc. 117) is **denied**.

3. Defendant's motion to suppress evidence obtained by the search and seizure of Defendant's residence (Doc. 119) is **denied**.

4. Defendant's motion for a voluntariness hearing and to suppress statements (Doc. 126) is **denied**.

5. Defendant's motion in limine (Doc. 134) is **denied**.

6. Excludable delay pursuant to U.S.C. § 18:3161(h)(1)(D) is found to run from 9/17/2019.

Dated this 3rd day of January, 2020.

David G. Campbell
Senior United States District Judge